

**SEALED**

300PD2104

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2022 NOV -3 PM 2: 03

DEPUTY CLERK

## IN THE UNITED STATES. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS DALLAS DIVISION

UNITED STATES OF AMERICA ex rel. §
PAMELA DAVIS-VAUGHN, §
    Plaintiff/Relator, §
§    **CAUSE NO.**
v. §
§
FERNANDO GUZMAN, EUGENIO §    3 - 2 2 C V 2 4 6 3 - B
GUZMAN, and BRENDA BROWN- §
LAIN, Defendants §    _____
§

### RELATOR'S ORIGINAL COMPLAINT FOR QUI TAM RELIEF
### [FILED UNDER SEAL]

The United States of America, by and through Relator Pamela Davis-Vaughn ("Davis-Vaughn" or "Relator"), files this Original Complaint for Qui Tam Relief and notifies the Court that Relator is a whistleblower regarding violations of the Federal False Claims Act and violations of the Internal Revenue Code committed by the Defendants.

### EXECUTIVE SUMMARY

Fernando Guzman and Eugenio (Gene) Guzman ("Fernando" and "Gene" respectively; collectively, "the Guzmans") are brothers. Together, they own 800 of the 1200 shares of stock in the Texas corporation, G&C Direct Mail Marketing, Inc. ("G&C" or the "Company"). Fernando is the elder and in charge of the company; he openly claims to control 2/3 of the stock.

Since at least 2013, the Company has paid a U.S. Postal Service employee to bypass established legal requirements for payment of bulk mail (known also as "standard mail" or "marketing mail") postage and, in the process, cheated the United States Postal Service

and the Internal Revenue Service out of millions of dollars through two schemes: (1) using the USPS employee, Brenda Brown-Lain ("Brown-Lain"), to certify artificially low shipping rates or artificially low counts for standard mail shipments in exchange for cash payment of 10% of the mailing's full value; (2) issuing checks to a check-cashing service in exchange for cash, which the brothers then distribute to themselves and do not record as distributions from the company, a technique that means the Guzman brothers are siphoning money from the company and ensures that the Guzmans avoid paying income taxes on distributions of company funds or, alternatively, having the funds declared as non-deductible expenses due to the use of the funds in payment of bribes to a U.S. Government official, the same Brown-Lain.

G&C has paid Brown-Lain hundreds of thousands, or even millions, of dollars in bribes to use her position in falsifying postage for bulk mail operations of G&C Direct Mail Marketing, Inc.

## A. VENUE, JURISDICTION AND STANDING.

1. Jurisdiction is proper in this Court because this action involves a federal question. The Guzmans are liable for bribery of a public official, a US Postal clerk, under 18 U.S.C. § 201(b)(1) and for Federal false claims under 31 U.S.C. § 3729(a)(1)(C) and (G). The Guzmans are also liable for mischaracterizing their income and thereby underpaying their taxes, and Relator is the whistleblower regarding such underpayments under 26 U.S.C. § 7623(b).

2. Davis-Vaughn is the Relator under the Federal False Claims Act. She is the primary witness to the Guzmans' activities that have removed assets from G&C, and

withheld funds from the Postal Service, bribed a public official, and caused underpayment of taxes. Since obtaining a 33.33% interest in G&C on November 9, 2013, Davis-Vaughn has been a shareholder of G&C and has held the same ownership interest. Relator brings this action to recover damages and civil penalties on behalf of the United States of America, for violations of the False Claims Act arising from false or fraudulent records, statements, or claims, or any combination thereof, made, used or caused to be made, used, or presented, or any combination thereof, by the defendants, their agents, employees, or co-conspirators, or any combination thereof, with respect to the Guzmans' scheme to defraud the United States Postal Service ("USPS" or "Postal Service") and/or the Internal Revenue Service.

3.     The Court has personal jurisdiction over Defendants because each is a natural person who is a citizen of Texas and who took the actions complained of in this District.

4.     Fernando Guzman is the president and registered agent of G&C and can be served personally at its offices 1275 Profit Drive, Dallas, Texas 75247.

5.     Eugenio (Gene) Guzman is the G&C vice-president of operations and can be served at 1275 Profit Drive, Dallas, Texas 75247.

6.     Brenda Brown-Lain is a natural person who lives at 3620 SE CR 60, Corsicana, Navarro County, TX 75109, which is in this District. She works as a U.S. Postal Service postal clerk at BME, 951 W Bethel Rd. Coppell, TX  75099. She is subject to personal jurisdiction in this District.

7.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because Brown-

Lain is a permanent resident of Navarro County, Texas, which is within this District and this Division. Venue is also proper under 28 U.S.C. § 1391(b)(2).

**B.   BASIS.**

8.      Congress enacted the False Claims Act during the Civil War. It amended the False Claims Act in 1986 to enhance the Government's ability to recover losses it sustained from fraud against the United States because Congress found that fraud in federal programs was pervasive and that the False Claims Act needed modernization. Congress intended that the 1986 amendments incentivize individuals with knowledge of fraud against the government to disclose their information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

9.      The False Claims Act renders any person who violates its prohibitions liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the Government.

10.     Any person having information about a false or fraudulent claim against the Government can bring an action for himself and the Government and share in any recovery. The complaint must be filed under seal for at least 60 days, without service on the defendants, to allow the Government time to conduct its own investigation and to determine whether to join the suit.

**C.   PARTIES**

11.     G&C is a direct mail marketing and printing company. Formed by Mark Cowell ("Cowell") with Fernando Guzman and Eugenio Guzman on July 14, 1999, the

business has existed for more than two decades. From 1999 to December 30, 2004, G&C operated as an S corporation. After converting, from December 31, 2004 to July 13, 2007, G&C was an LLP. On July 13, 2007, the company converted back into a Texas corporation and has remained incorporated and operated as an S corporation since 2007.

12.     Until March 31, 2022, Davis-Vaughn was the G&C Chief Financial Officer. Previously, she had been the outside CPA whom the company used to assist with its bookkeeping and prepare its tax returns. The Guzman brothers obtained multiple loans from her totaling $350,000 from 2012 through 2013.

13.     On November 9, 2013, Davis-Vaughn acquired Cowell's former shares and became a 33.33% owner of G&C in exchange for converting approximately $250,000 of her loan to the Company to equity. Cowell no longer holds a position nor owns any interest in G&C. Neither of the Guzman brothers has contributed money to the company in exchange for his equity share. They have contributed to G&C equity by refinancing the building located at 1275 Profit Drive, which the Guzman brothers formerly owned in a separate entity (Cowell & Guzman Enterprises LLC, or "Cowell & Guzman Ent.") with Cowell. Until it sold the building in 2022, G&C leased the building from Cowell & Guzman Ent.

14.     G&C is a corporation formed under the laws of the State of Texas and a "closely held corporation" as that term is defined in Section 21.563(a) of the Texas Business Organizations Code.

15.     Brown-Lain is an employee of the United States Postal Service. She has solicited and conspired to take bribes from G&C in exchange for under-stating or under-

reporting postage used or mailing volume.

**D.    FACTS.**

### A Successful Direct Mail Marketing Business.

16.    In 1999, Cowell started G&C with the Guzman brothers. Cowell had sales experience; the Guzman brothers claimed experience with the machinery that automated the large runs of printing, folding, cutting, and collating the mailers that are the stock in trade of the direct mail marketing industry.

17.    The company professes great success and viability – it has been profiled in the Dallas Business Journal and has expanded operations to meet customer needs – but is deep in debt, has had to borrow money at payday-loan interest rates on multiple occasions to make payroll, and has allowed the Guzman brothers to treat its bank accounts as their slush fund.

### Davis-Vaughn Loans Money to G&C; Becomes an Owner.

18.    In 2012, G&C lost its top customer, which had represented more than 75% of its sales. At the time, Davis-Vaughn was G&C's outside CPA who prepared the company's tax filings. The Guzman brothers approached her for financial assistance. To help the company remain afloat, Davis-Vaughn agreed to loan it $350,000 in a series of loans made over approximately 6 months.

19.    On November 9, 2013, Cowell surrendered his 400 shares to the Company, which then transferred them to to Davis-Vaughn in exchange for a $250,000 reduction in principal of the outstanding loans she had made to the Company. As part of the transaction, Davis-Vaughn signed the Amendment to Shareholders' Agreement in which

she, the Guzman brothers, and G&C agreed that all references to "Shareholder" included Davis-Vaughn and all terms and conditions of the Shareholders' Agreement applied to her. A true and correct copy of the original agreement with the amendment is contained within Relator's Disclosure, which will be served upon the Government. By resolution of its directors, G&C agreed to issue 400 shares to Davis-Vaughn; that resolution is contained within Relator's Disclosure.

20.     Davis-Vaughn is a certified professional accountant. Her resume is attached to her Relator's Disclosure.

21.     Before she loaned the company $350,000, Davis-Vaughn had been its outside accountant. Once she became a shareholder, she retained her personal CPA practice until 2020. From 2013 to early 2020, she was only tangentially involved in the company's affairs – she had an ownership stake but primarily worked as its part-time in-house CPA while also traveling the country teaching classes for CPAs to meet their continuing education requirements. Davis-Vaughn used the title of Chief Financial Officer of G&C and so identified herself when acting for the company.

22.     From 2013-2020, the Guzman brothers each made the same amount of W-2 wages, between $200,000 and $250,000. In 2020, Fernando increased their W-2 salary amounts to $300,000 each. Gene's reasoning for the raise, as expressed to Davis-Vaughn, was simply that they "had not had a raise for awhile."

23.     In 2020, Fernando Guzman asked Davis-Vaughn to work with the company on a full-time basis as its CFO and give up her other business ventures to focus on G&C; she agreed. Thereafter, Davis-Vaughn became the full-time CFO and only then

discovered the breadth and full scope of the Guzmans' interactions with postal clerk(s), the misuse of corporate funds, and the endangered state of the business.

**The Guzman Brothers' Schemes.**

24.     By virtue of their officer positions, the Guzman brothers have access to the G&C books and accounts. As such, they have the ability and means to mischaracterize funds and accounts, limit access to financial matters, and ultimately to misuse company funds. And they have.

25.     Due to the combination of the Guzman brothers' repeated removal of cash from the company, improvements to the building that G&C financed, even though it was the sole tenant in a building whose owners were the Guzmans and Cowell through Cowell & Guzman Ent., and purchasing the costly equipment required to provide services to clients, G&C has acquired approximately $4.3 million in long and short-term debt, all of which is personally guaranteed by the shareholders.

26.     Cash mismanagement has required the company to factor invoices (essentially, borrow against accounts receivable) or borrow from lenders at 20% interest rates to fund weekly payroll, which has occurred as recently as August 2021. The owners have also personally guaranteed a working capital credit line at Veritex bank which the Company heavily relies upon for six months out of the year. Most recently, the Company obtained a loan from Gene Guzman at 18% interest, which constitutes a breach of his fiduciary duty as a director.[1] Even after receiving more than $2 million in PPP funds that

---

[1] As a G&C director and shareholder, Relator has refused to approve and/or ratify the loan and interest rate.

G&C legally applied for and had forgiven, the Company remains cash-strapped for most of the year. G&C has monthly debt payments of approximately $150,000 until its loan from Gene is repaid in 2023.

27.     But the Guzman brothers have done far more damage to the company than wasting working capital, purchasing underutilized expensive equipment, and forcing the shareholders to secure the company's debts.

### Bulk mailing basics

28.     Bulk mailers can substantially reduce postage costs on large mailings because the USPS allows them to send the large mailings by "Marketing Mail." The Post Office uses Marketing Mail to refer to the most commonly used category of bulk mail, previously called Standard Class, Standard A, or Third Class. The Marketing Mail classification of bulk mail is used for most advertising mail, newsletters, and political mail. The more that bulk mailers pre-sort mail by class or geographic destination, the greater the level of discount they can receive from the USPS.

29.     Marketing Mail saves a for-profit business at least 38% off of first-class postage rates, with higher savings possible. Nonprofits save even more by using Marketing Mail because rates for registered nonprofits are between 55% and 80% less than first-class postage rates.  Recent postal rate increases that took effect in July 2022, plus probable rate increases that will be enacted in 2023, have made non-profit organizations increasingly sensitive to price. That sensitivity could provide additional incentives to mailing organizations to "cut corners" by finding "work arounds" for the rules.

30.    Mailing companies like G&C have a Post Office-issued Standard Mail Permit. The permit acts as a trust account – the mailing company places funds with the USPS, the mailing company puts the cost of mailings on its permit, and the USPS debits money from the permit-holder's account to pay for postage. Mailers must apply for permits separately to each post office entry unit at which they anticipate dropping off bulk mail.

31.    Each bulk mailing must include at least 200 identical pieces. To qualify for the lowest rates, letters and cards must meet certain physical standards. Mailers also must ensure the accuracy of their mailing list so that the Postal Service does not handle mis-addressed bulk mail. Mailers must determine if the recipient has moved ("Move Update" or "NCOA" checking) and if the address is accurate ("CASS" certification).

32.    G&C uses software to check a mailing list against the National Change of Address ("NCOA") database and update any changed addresses so it can qualify for bulk mail rates. This is the Move Update requirement. The USPS offers extra discounts for adding barcodes, accurate zip + 4 codes, and an extra two-digit "delivery point code" that specifies the exact mailbox where the piece should be delivered.

33.    Mailers who add barcodes to their mail are required to "CASS certify" their list. Intelligent Mail barcodes ("IMb"), which are used on postcards, letters and flat packages, sort mail down to the individual address. Adding these codes to the mail, instead of having the USPS do so, also enables the mailer to obtain discounts. If the mailer uses IMb codes and submits its USPS paperwork electronically, the USPS will provide free address corrections and some limited tracking. For a bulk mailer that always adds

barcodes and submits the paperwork electronically, the USPS will waive the $275 annual mailing fee.[2]

34.     Mailers must have a mailing permit for Marketing Mail to use Marketing Mail rates. Mailer fees depend on the method they use to send the mail either a "postage paid" box (also known as a "permit imprint" or an "indicia"), or a special bulk rate postage stamp ("precanceled stamp") affixed to the mail, and the mailer pays the postage balance to the post office. Postage must be pre-paid or payable by permit imprint, meter indicia, pre-canceled stamps, or other methods that do not require cancellation at the post office. The class of mailing (such as "Presorted Standard" or "Nonprofit") must be printed directly below or to the left of the imprint or stamp, and other price-specific markings may also be required.

35.     Each mailing delivered to a USPS entry unit must be accompanied by paperwork produced by PAVE-certified or Manifest Analysis and Certification (MAC)-certified software that specifies the name of the mailer and the mailing, a mailing identification code, the date, the class of mail, and the DMM standard (such as 245.10.0 for standard mail automation letters) being claimed. At the end of the documentation, a summary of the number of pieces mailed at each price by postage payment method and by entry point, as well as the number of pieces in each mailing, must be included. The postage statement identifies the mailer, how many pieces in the mailing, number of trays or sacks containing the mailed pieces, and the expected postage amount.

---

[2] Mailers can choose basic or full service barcoding. Basic barcoding receives postage savings but no additional benefits. Full service barcoding receives all the benefits described above but requires the mailer too electronically submit its paperwork.

36.    Finally, the mailer has to deliver the bulk mail to the USPS bulk mail entry point with its paperwork.

**Shortchanging the USPS.**

37.    The Guzman brothers have siphoned more than $3,000,000 from the Post Office to themselves and to Brown-Lain in a fraudulent check-cashing scheme in recent years – and the estimate provided above is likely far short of the actual amount because the Guzman brothers have perpetrated this fraud for more than a decade. The scheme enables Brown-Lain to receive substantial sums to augment her Postal Service compensation, and for the Guzman brothers to retain for themselves sizable funds supplied by G&C clients to pay for postage without accounting for the clients' actual costs. The Guzman brothers also avoid paying taxes on the additional, undeclared income.

38.    G&C's business depends upon its bulk mail customers. Various agencies place orders for bulk mail campaigns and G&C fills the orders by inserting the bulk mail letters into envelopes, printing labels and materials, or some combination of services. Customers may use the G&C bulk mail permit, USPS-approved postage indicia, stamps, commingling services provided by companies like Pitney Bowes, or any combination of those mailing methods. Customers who have their own permit number with the post office can send checks to G&C to be deposited on their behalf with the USPS. Regardless of the method being used, customers must *prepay* G&C for postage fees before it processes the job. The prepaid postage fees for customers without their own permit number are deposited into the same operating account that G&C uses to pay operating

expenses and into which it also deposits its gross sales receipts.

39.     G&C receives substantial postage fees from clients to purchase stamps from the USPS and to prepay postage charges that will be accumulated under the G&C bulk mail permit. Postage amounts deposited into G&C's bank account in recent years have totaled $12.5 million in 2018, $17.3 million in 2019, $22.5 million in 2020, and $27 million in 2021 – approximately $80,000,000 total since 2018.

40.     Client payments for G&C's services that include depositing the bulk mail with the post office are due when the mail is delivered to the bulk facility or the commingle facility. Bulk mail orders that G&C fills go to all parts of the country and are usually targeted for specific purposes such as political, or non-profit fundraising campaigns. Such campaigns are coordinated by the client's agency – G&C has to ensure delivery of finished orders to the post office by specific mail-out dates so the bulk mail can be timed to reach recipients all over the mainland United States on about the same day. G&C's location in Dallas is desirable for nationwide bulk mailing campaigns because mailing times to California, the northern Midwest and the northeast are roughly the same, which makes coordination easy.

41.     As a Mail Service Provider business, G&C has a Bulk Mail permit, #4043, from the USPS. G&C has a trust account at the post office associated with its Bulk Mail permit. When it uses the permit, G&C remits funds to the post office for postage.

42.     G&C's primary client is RKD Group, a fundraising agency that performs marketing services for nonprofit organizations. RKD Group is the only one of G&C's large clients that uses the G&C Bulk Mail permit. RKD Group mailings account for more

than 50% of G&C billings.

43.      G&C uses Form 3602 Postage Mailing Statement (USPS Form 3602) to show the type of postage used, weight of single piece of mail, number of pieces, types of discounts and postage due. The completed form is uploaded to the USPS database, Postal One, by the postal clerk receiving mail.

44.      When G&C sends mail to a bulk mail facility for delivery closer to the recipients' location, it uses Form 8125 Plant-Verified Drop Shipment Verification and Clearance (USPS Form 8125).  For example, mail destined for Los Angeles may be trucked to the Los Angeles BME.

45.      When submitting bulk mail to the post office, mail depositors must furnish postal paperwork that provides the post office with the details of the submitted mail. This "postal statement" lists the number of pieces mailed, type of postage used, which postage is pre-paid, and similar information. Falsely stating postage has been pre-paid[3] or underreporting piece numbers or lot size[4] can result in underpaying for USPS services.

46.      The Guzman brothers exclusively control the postal paperwork at G&C and the use of postage fees. G&C clerk Alejandra Lazaro keeps a second set of G&C books pertaining to postage use and outgoing bulk mail shipments by hand. She knows the outgoing volume, and how much postage G&C needs to purchase relative to the amount of money that needs to be placed on the meters to enable the mail to have postage placed

---

[3]    *See*    https://www.justice.gov/usao-cdca/pr/retired-postal-worker-sentenced-over-8-years-prison-bribery-scheme-involving-bulk-mail, last accessed May 24, 2022.
[4]    *See*    https://www.justice.gov/usao-cdca/pr/president-oc-based-bulk-mail-company-pays-3-million-resolve-investigation-scheme, last accessed May 24, 2022.

by indicia. She tells the Guzman Brothers how much postage will need to be run on the meters, she will also request stamps - both number of stamps and denomination - that need to be purchased that day. The Guzman brothers are the only G&C personnel who could reconcile money received or converted to personal use since they are the only people who have access to the dashboard at the USPS for G&C's account.

47.     The Guzman brothers have ensured that only they, and no one else, at G&C has access to all of the postage records. Postage amounts received from customers are deposited into the G&C operating/postage account and thus recorded in QuickBooks®. Stamps purchased, checks written to put money on the permit, and withdrawals from the operating/postage account to put money on meters for indicia purposes, are all reflected in QuickBooks® as deposits into or checks/withdrawals made out of the operating/postage account. At the Guzman brothers' insistence, the company keeps no postage records by customer or job in either QuickBooks® or their production software, Midnight.

48.     G&C invoices customers for postage by email after the data processing department calculates the best method for mailing the job. G&C utilizes a separate production software, Midnight, for invoicing and keeping track of production costs. The company does not invoice postage through the Midnight invoicing system. Customers simply receive an email stating the amount of postage that is needed to send the job. The G&C customer service representatives ("CSR") note postage used in the comment section of the customer's invoice. Since the postage is noted in the comment section of the invoice, the charges for postage on a specific job are not uploaded into the QuickBooks®

accounting software. The only accounting of the postage used for each job consists of the notations that the CSRs make on invoices.

49.     Because the Guzman brothers directly create or supervise the preparation of postal forms (Forms 3602 and 8125) the company uses for Marketing Mail, Fernando and Gene are the only people at G&C who have access to all information related to the billing and collection of postage to clients as well as the purchasing of postage from the USPS or a commingler like Pitney Bowes.

50.     The Guzman brothers control the process of creating the postage paperwork that G&C sends to its clients, any use of the postal service's electronic Dashboard online shipment system, and any hand-prepared paperwork that is submitted to the post office. By their own design, they are also the only personnel at G&C who can access the company's postal account, or Dashboard, at USPS.

51.     Although the Guzman brothers hired Lenora "Deni" Stader to help with the postal paperwork, she works behind closed doors in a locked office at the back of the building where G&C has its offices and limits her communication with other employees.

52.     One of the Guzman brothers or Stader creates the USPS Form 3602 and/or 8125 for the client that contains the actual number of pieces and amount of postage. They then prepare *different* paperwork for Post Office approval, which will ultimately be submitted to the USPS with the mail. The information submitted to the Post Office represents a far *lower* piece count and postage amount.

53.     Relator understands that at this point in the process, Brown-Lain performs her role. The same USPS postal clerk has been clearing the mail for G&C for at least the

last 15 years.

54.     Upon information and belief, as stated by Fernando Guzman to Davis-Vaughn, Brown-Lain receives money from G&C equal to 10% of the proper postage charge per mailing. She "earns" that money by coming to G&C's office, approving mailings, and certifying a *far lower* total of bulk mail than what G&C has prepared for mailing.

55.     By stamping the appropriate Postal Form 3602 and/or 8125 with her official USPS "round stamp," Brown-Lain manifests the Post Office's acceptance of the type and count of standard mail. After Brown-Lain certifies the amount, she has G&C pay the USPS the postage amount that the artificially low mail total would incur. Thus, the Guzman brothers pay Brown-Lain to approve under-stated postal charges and mailing piece totals so G&C can avoid postage fees. The Brown-Lain approved paperwork shows a much smaller volume than actually processed and may not show postage at higher rates.

56.     Brown-Lain will come to G&C's office as necessary, up to multiple times per week, to approve postal forms. She will also meet one of the Guzman brothers in an area away from her post office and the G&C premises. A surveillance report of meetings between the Guzman brothers and Brown-Lain, conducted in January 2022, is attached to the Davis-Vaughn Disclosure.

57.     Brown-Lain reviews the mailings and approves the bulk mail submissions, usually while working in the warehouse office on G&C premises. Once she has finished, G&C has two sets of postal paperwork for its mailing – the receipt it submits to the client

to show an accurate count of mail and postage charges that G&C should have incurred, and a receipt with lower totals that G&C submits to the post office with Brown-Lain's literal stamp of approval. This allows G&C to pocket the difference between the postal fees it represents to its client RKD, which uses G&C's permit, and the actual amount paid to the USPS.

58.     The Guzman brothers also pay Brown-Lain to move mail campaigns that will not be ready until after the mail-out date so that even campaigns mailed late will meet client timelines.

59.     In addition to paying cash to Brown-Lain, the Guzman brothers provide her with free printing services and allow her to use the services of both employees and equipment for free.

60.     In March 2021, Gene Guzman furnished Brown-Lain a statement on G&C letterhead that states: "This letter serves as employment verification for Brenda Lain. She has been working with [G&C} since February 2019. She is currently at a salary rate and nets $592.00 per week." The letter is included with Relator's Disclosure.

61.     In March 2021, Gene Guzman furnished Brown-Lain a statement on G&C letterhead for her husband, Ronnie Lain, that states: "This letter serves as employment verification for Ronnie Lain. He has been working with [G&C} since February 2019. He is currently at an hourly rate of $25.50 and on pace to make $58,000 for the year working an average of 50 hours per week." The letter is also included with Relator's Disclosure.

62.     Brown-Lain was never on G&C's payroll while Relator worked for the Company.

63.     Ronnie Lain was never on G&C's payroll while Relator worked for the Company nor was he paid as a 1099 contractor.

64.     Before the USPS increased its emphasis on having mailers use the seamless acceptance system, bulk mailers commonly had a postal clerk come to their offices to examine the mail prior to being sent, compare it to the postal paperwork, and then certify the amount of prepared mail. Larger mailers have embraced the seamless acceptance system, therefore there is no need to have a postal clerk "stamp" the mail on site for bulk mailers. The IMb imprinted on every piece of mail, as required for streamlined mail, further reduces the need for a Postal Clerk to stamp the mail.

65.     Small bulk mailers like G&C continue to use the paper postal forms. For that reason, none of Brown-Lain's activities such as going to G&C's facility, approving mailings on site and pre-clearing the project for mailing out would *seem* unusual.

66.     Nonetheless, a single postal clerk normally does not service a single client for multiple years, physically examine the mail, complete all the paperwork behind closed doors in the offices of the mailing company's owners, and then routinely meet off premises to receive an envelope from one of the Guzman brothers.

67.     While at G&C, Davis-Vaughn had no access to the Dashboard system that allows G&C to interface with the United States Postal Service for delivery and mailing of bulk jobs, or any of the software that G&C used to generate the postal paperwork such as Forms 3602 or 8125. That access has been restricted to the Guzman brothers and the USPS. For record-keeping, Davis-Vaughn would consider monies received from customers as pre-paid postage and then offset the postage received by amounts paid to

the USPS on the permit, stamps used, and amounts drafted from the bank account to purchase postage from the meters for indicia or paid to comminglers for processing mail on behalf of clients. From an accounting perspective, the monies G&C received were kept in a liability account with the idea that when the Company purchased postage, the purchase would offset the prepayment. Fully and accurately stated, the "postage liablity" entry in the chart set forth below should be $0 for each year. Since G&C often paid substantially less postage to the USPS than it charged to clients, G&C ended with positive balances in the postage liability account – such as the $4.7 million credit balance in the postage account for 2021, and the $2.9 million credit balance it had for 2020.

|  | Postage Liability | Gross Receipts | Total Postage Receipts deposited to bank |
|---|---|---|---|
|  | Bal at 12/31 | by year | account |
| 2017 | 96,097 | 8,301,630 | 11,666,045 |
| 2018 | 317,508 | 9,361,052 | 12,448,717 |
| 2019 | 1,043,596 | 12,106,368 | 16,645,770 |
| 2020 | 2,919,196 | 11,676,111 | 22,206,292 |
| 2021 | 4,732,665 | 13,523,952 | 26,272,261 |
|  |  | 54,969,113 | 89,239,085 |

68.     The Postal Service has had electronic submission options available to bulk mailers for years - through the USPS Dashboard or Seamless Acceptance service. Under the Seamless Acceptance service each envelope has a separate IMb stamped on it, which allows the USPS to determine the amount of postage and the volume of the mailing by electronically scanning the envelopes. The IMb make falsifying the postage amount or

the piece count almost impossible.[5] Using Seamless Acceptance exclusively would force the Guzman brothers to submit the mailings for inspection and acceptance after scheduling the mailing with the USPS. It would also remove the Guzman brothers from having direct contact with the postal clerk who verifies the mailing. Thus, G&C uses the Dashboard and electronic job submission for various clients. But G&C submits hand-completed paperwork to avoid detection of underpayment for RKD mailings.

69.     Brown-Lain uses printed forms for the RKD mailings such that the postal paperwork is on actual paper, which allows the Guzman brothers and G&C to avoid submitting jobs electronically.

70.     The Post Office wants mail service providers to use Seamless Acceptance because the system utilizes IMb on mail containers, handling units (trays, sacks), and mail-pieces to provide end-to-end visibility and eliminate the need for a paper Form 8125 verification. Full Service Seamless Acceptance requires using unique IMb on all containers, trays, and pieces of mail, and electronic submission of postage statements and USPS forms.

**Funding the Fraud – How G&C Pays Brown-Lain and not the USPS**

71.     G&C incoming mail always goes to the Guzman brothers first. Checks to pay for invoices then go to the accounting department. Checks to pay for postage go to the CSRs for the company's customers because CSRs invoice customers for postage. Clients also pay by electronic transfer of funds directly to the G&C bank account for

---

[5] The USPS formerly weighed bulk mailings as they were delivered to determine the validity of the paperwork but discontinued that procedure several years ago.

postage, invoices, or both. For certain client ETF payments, Fernando or Gene will be notified of the transfer by the bank and then inform the accounting department how to allocate.

72. Postage amounts should be segregated into a separate bank account and tracked by customer because the money received does not belong to G&C. Segregating postage funds from operating accounts is the norm in the bulk mailing industry. Davis-Vaughn or accounting personnel entered an offset for each postage amount deposited in G&C's operating account in the QuickBooks® software she used to track G&C funds.

73. When postage funds were deposited in the bank account, Davis-Vaughn added a corresponding amount to G&C's postage-liability account – an electronic record of postage liability. Those postage liability amounts are not tracked by customer in the company's accounting software. Fernando Guzman repeatedly denied Davis-Vaughn's requests to establish separate bank accounts for postage and operations. He also denied her requests for information that would allow G&C accounting to track postage amounts by client.

**The Mechanics of G&C's Fraud.**

74. To effectuate fraud on the company, the Postal Service, and the G&C clients, either Fernando will create a check from the company's QuickBooks® software or Gene will hand-write out a check from the company ledger (Gene does not use QuickBooks®). Invariably the check is payable to "Jack's" or "Jacks," which refers to Jack's Check Cashing, a business located at 1606 Market Center Blvd. in Dallas that cashes checks. Copies of substantially all checks written to Jack's from 2017-2021 are included with

Relator's Disclosure.

75.     Because Jack's cashes one or more checks for more than $1,000 per person, per day, it is a "check casher" type of money services business subject to 31 C.F.R. § 103.11(uu)(2). Jack's must comply with the Bank Secrecy Act, 84 Stat. 1114. To that end, any purchase of negotiable instruments by Jack's exceeding $10,000 must be reported to the IRS.

76.     The "Jack's" office resembles a shipping container. At the check-cashing site, every employee is called "Jack." Once the Jack of the day cashes the check, he kicks back the cash – less the company's check-cashing fee – to the check-writer, either Fernando or Gene. This is a simple money-laundering technique. Photos of the Jack's facility are included in Relator's Disclosure.

77.     To avoid incurring Jack's IRS-notification requirement, Gene and Fernando ensured that every check they cashed at Jack's was for less than $10,000.[6] An Excel spreadsheet Davis-Vaughn prepared from the QuickBooks data and cross-referenced with copies of the handwritten checks prepared by Gene has been saved as a pdf and reprinted and included with Relator's Disclosure.

78.     The Guzman brothers are the only G&C employees who generate checks to Jack's. Only their personal signatures appear on the checks being cashed. As of October 2021, however, the Guzman Brothers also resumed writing checks to "cash" at Veritex Bank. Exemplar copies of such checks are included with the Relator's Disclosure.

---

[6] This is a trick well-known to any person seeking to move cash around without the IRS catching on, as popularized 20 years ago in season 4, episode 8 of *The Sopranos*.

Between January 1, 2013 and June 20, 2019, they also wrote a total of $231,157.15 in checks to "cash" at Veritex bank.

79.     The process is simple – Gene or Fernando writes out a check and obtains cash from Jack's. They then use the cash proceeds to pay Brown-Lain from the postal savings. Thus, the Guzman brothers keep the postage money for their own purposes and write out checks for cashing by Jack's to pay off Brown-Lain.

80.     Davis-Vaughn learned that Brown-Lain receives 10% of the value of USPS postage invoices from the USPS and the Guzman brothers retain the rest. Davis-Vaughn has never received an invoice, bill, statement of services, receipt or similar documentation from either Guzman brother delineating the use and/or necessity of any payment to Jack's.

81.     Included with the Relator's Disclosure is an electronic copy of a conversation she had with the Guzman brothers in April 2021 during which she learned details of how the Guzman brothers defraud the USPS. The conversation has not been fully transcribed. An electronic copy has been provided to the Department of Justice and the United States Attorney for the Northern District of Texas as part of the Disclosure.

82.     In the discussion, Davis-Vaughn obtained information on how the Guzman brothers launder money through Jack's and how they pay the postal clerk. The Guzmans estimate they have furnished $3.1 million in cash to Brown-Lain. If $3.1 million is 10% of the money they have not properly remitted to the United States Postal Service, then it is the only part of $31,000,000 that they have accounted for. As noted above, from 2018-2021 alone, G&C received nearly $80,000,000 earmarked by clients for postage.

83.    Among the highlights of the recorded conversation are the following:

a.    At 44:36 of the recording, Fernando Guzman says "You find we do it on RKD. They use our permit. That's the whole key to this is that everything goes through our permit and our permit is like a bank account. Nobody can get in unless we authorize. So no one can track the money going in and out of there."

b.    Fernando Guzman (45:30): "The thing is, since we are not running the paperwork through the post office or all of it through the post office, there is no paper trail. There's nothing there. They can never…no way…that they can trace it and they don't hold anything. They don't go, they don't keep track of all the paperwork, that's why we try to stay away from the electronic statements."

c.    Around 56:00, Gene notes that he keeps track of the amounts owed to Brown-Lain on his phone, and she also tracks amounts to be paid on her own phone.

**Davis-Vaughn's First Attempt to Reform G&C.**

84.    To increase company revenues and attract more clients, in mid-2020 Davis-Vaughn sought to make G&C SOC-2 compliant. SOC-2 is an auditing procedure devised by the American Institute of Certified Public Accountants ("AICPA"), which also promulgates auditing standards and GAAP - Generally Accepted Accounting Principles. SOC-2 certification would tell potential G&C clients that it securely manages their data to protect their organizational interests and privacy.

85.    During the course of working toward SOC-2 compliance, Davis-Vaughn had the recorded discussion with the Guzman brothers referenced above in which she discovered the Brown-Lain bribery procedures and how G&C supplied false data to the USPS.

86.    In late October 2021, Davis-Vaughn brought a shareholder derivative

lawsuit against the Guzman brothers for their misuse of company funds. The information regarding the postal kickback scheme set forth above was not included in the lawsuit.

87.    During the lawsuit, Davis-Vaughn continued to work at G&C. She ceased doing the company's tax preparation and analysis, and instead maintained the books so that an outside accountant would be able to use the raw data to prepare the company's tax returns.

88.    Also, during the lawsuit, the company hired outside accountant Robert Justice to oversee preparing the tax returns and itemizing the company's various costs.

89.    The lawsuit concluded with a settlement, one condition of which was Davis-Vaughn's resignation from the company. She currently has read-only access to the company's QuickBooks® Online account.

90.    Mr. Justice continues to work on the G&C tax statements. In May 2022, he changed the accounting mechanism for prepaid postage. All prepaid funds are treated as income and the amounts paid towards the permit, purchase stamps, paid to comminglers, or amounts drafted from the bank account to purchase postage on a meter are treated as expenses. Postage prepayments are no longer treated as money held in trust or dedicated for paying postage. Instead, Mr. Justice has claimed that if G&C receives money from clients in payment for postage that exceeds the amounts remitted to the USPS, G&C should consider that overpayment revenue benefitting the company.

91.    By contrast, Davis-Vaughn double-entered prepaid postage from clients such that upon receipt, the money was treated as a deposit to the G&C operating bank account (designated as postage on Quickbooks®) and a liability owed to the client. Once

G&C spent the prepaid postage (putting money on the permit, purchasing stamps, uploading money to postage meters, or similar), Davis-Vaughn credited the amount from the same bank account just like a check that was written on the account and debited against the liability. In this manner, Davis-Vaughn sought to accurately reflect the reduction of postage being held on behalf of G&C's customers.

### FIRST CAUSE OF ACTION – LIABILITY UNDER 31 U.S.C. § 3729(a)(1)(G)

92. Relator restates and reaffirms the preceding paragraphs as if fully set forth herein.

93. Relator specifically claims that Fernando Guzman, Gene Guzman, and Brown-Lain made, used, or caused to be made or used, numerous false records or statements material to G&C's obligation to pay or transmit money or property to the Government.

94. Relator specifically claims that Fernando Guzman, Gene Guzman, and Brown-Lain, knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government in the form of postage payment obligations of G&C that the Guzman brothers and Brown-Lain under-reported to the USPS.

95. In addition, Relator specifically claims that Fernando and Gene Guzman knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government in the form of unpaid taxes on income – specifically, the cash remittances from checks to Jack's that they did not pay to Brown-Lain.

96.     Information regarding the specific amounts and dates of such underreported transactions resides wholly within the purview of the Guzman brothers and Brown-Lain. To the extent the USPS retains records of paperwork submitted by G&C, it also has certain records that may corroborate the facts set forth above.

97.     Fraud claims such as Davis-Vaughn's allegations require pleading of who, what, where, when, why, and how of the fraud. The facts set forth above provide the particularity of defendants' fraud in all respects except specific dates and specific amounts of the fraud. Relator's disclosure to the Government includes dates of checks written to cash that fueled the Guzman's scheme because such cash was used, in large part, to pay Brown-Lain for approving false USPS records. Remaining information regarding the Guzman brothers' fraud resides solely with defendants because defendants controlled all access to the records specifying the actual amounts of standard mail sent. The only people with access to the true mail amounts that G&C sent, not the false representation of the mailing amount that G&C represented to the USPS, and which Brown-Lain stamped as accepted by the USPS, are the Guzman brothers and Brown-Lain.

98.     By substantially falsifying and under-reporting bulk mailing specifics, the Guzman brothers caused to be made false records of obligations owed to the United States. Such false records deprived the United States of the proper fees owed for the services provided by the USPS.

**SECOND CAUSE OF ACTION – LIABILITY UNDER 31 U.S.C. § 3729(a)(1)(C).**

99.     Relator restates and reaffirms the preceding paragraphs as if fully set forth herein.

100.    By acting in concert, and jointly, to file false standard mail paperwork, the Guzman brothers and Brown-Lain conspired to take actions prohibited by 31 U.S.C. § 3729(a)(1)(G).

101.    Such conspiracy to violate federal false claims laws is actionable under 31 U.S.C. § 3729(a)(1)(C).

**OTHER RELIEF**

102.    Pursuant to 31 U.S.C. § 3730(d), Davis-Vaughn is entitled to the following from Brown-Lain and the Guzman brothers:

> a. 15-30% of the proceeds of the action or settlement, depending upon whether the Government itself prosecutes this action;
>
> b. The reasonable expenses Davis-Vaughn necessarily incurred in this action;
>
> c. Reasonable attorneys' fees and costs of court.

103.    This is not a retaliatory action, it is an action properly held by the United States Government.

## RELIEF REQUESTED

WHEREFORE, Davis-Vaughn prays for the following relief:

1)    A judgment against Defendants awarding the Government all damages caused by reason of the Defendants' fraud against the Government;

2)    A judgment awarding the Government three times the amount of damages the United States has sustained because of defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

3)      A judgment awarding Relator her reasonable percentage of the proceeds of any action or settlement;

4)      A judgment awarding Relator her reasonable expenses incurred;

5)      A judgment awarding Relator her reasonable attorneys' fee incurred;

6)      All such other and further relief as the Court deems just and appropriate.


Respectfully submitted,

**ATWOOD & MCCALL, PLLC**


By:/s/David D. Davis_____
        David D. Davis
        State Bar No. 00790568
        Russell J. DePalma
        State Bar No. 00795318
8150 North Central Expressway, Suite 1100
Dallas, Texas 75206
(972) 665-9600 (telephone)
Davis@atwoodmccall.com

**COUNSEL FOR RELATOR
PAMELA DAVIS-VAUGHN**

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| United States ex rel. Pamela Davis-Vaughn, Relator | Guzman, Fernando; Guzman, Eugenio; & Brown-Lain, Brenda |

**(b)** County of Residence of First Listed Plaintiff    U.S.A.
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Dallas
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

RECEIVED
NOV - 3 2022
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
David D. Davis and Russell DePalma; Atwood & McCall
PLLC, 8150 N. Central Expy., #1100, Dallas, TX 75206;
972-665-9600

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [X] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [X] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

3 - 2 2 C V 2 4 6 3 - B

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [X] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ |  |  | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | Pharmaceutical Personal Injury |  | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | Product Liability |  | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability |  | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** |  | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | **LABOR** | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards Act | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | [ ] 720 Labor/Management Relations |  | [ ] 485 Telephone Consumer Protection Act |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | [ ] 385 Property Damage Product Liability | [ ] 740 Railway Labor Act | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise |  |  | [ ] 751 Family and Medical Leave Act | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 790 Other Labor Litigation | [ ] 862 Black Lung (923) | [ ] 890 Other Statutory Actions |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | [ ] 791 Employee Retirement Income Security Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee |  | [ ] 864 SSID Title XVI | [ ] 893 Environmental Matters |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence |  | [ ] 865 RSI (405(g)) | [ ] 895 Freedom of Information Act |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General |  | **FEDERAL TAX SUITS** | [ ] 896 Arbitration |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 950 Constitutionality of State Statutes |
|  | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions |  |  |
|  |  | [ ] 550 Civil Rights |  |  |  |
|  |  | [ ] 555 Prison Condition |  |  |  |
|  |  | [ ] 560 Civil Detainee - Conditions of Confinement |  |  |  |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

| VI. CAUSE OF ACTION | Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*: 31 U.S.C. 3729 |
|---|---|
|  | Brief description of cause: Qui Tam |

| VII. REQUESTED IN COMPLAINT: | [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P. | DEMAND $ | CHECK YES only if demanded in complaint: JURY DEMAND: [ ] Yes [X] No |
|---|---|---|---|

| VIII. RELATED CASE(S) IF ANY | *(See instructions):* | JUDGE | DOCKET NUMBER |
|---|---|---|---|

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 11/2/2022   11/3/2022 | /s/ David D. Davis |

**FOR OFFICE USE ONLY**

RECEIPT #     AMOUNT     APPLYING IFP     JUDGE     MAG. JUDGE