IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

_____

UNITED STATES OF AMERICA,

    Plaintiff,

v.

FERNANDO GUZMAN, et al.,

    Defendants.

Civil Action No. 3:22-CV-2463-B

## COMPLAINT IN INTERVENTION

1.     Plaintiff, the United States of America, on behalf of its agency the United States Postal Service, files this complaint in intervention against Defendants Fernando Guzman, Eugenio Guzman (also known as Gene Guzman), and Brenda Brown-Lain (also known as Brenda Lain) to recover treble damages, civil penalties, and costs under the False Claims Act (FCA), 31 U.S.C. §§ 3729–33, and to recover damages and other monetary relief under the common law and equitable theories of fraud, conspiracy to commit fraud, money had and received, and unjust enrichment, in connection with a scheme to cheat the Postal Service out of the postage owed to it on bulk mailings.

2.     Fernando Guzman and Gene Guzman were, respectively, the president and vice-president of a Dallas company, G&C Direct Mail Marketing, Inc. (G&C), and also collectively held a majority ownership in the company.  G&C was a bulk mailer, meaning it printed and mailed large volumes of marketing mail on behalf of third parties.  As detailed herein, Fernando Guzman and Gene Guzman conspired with Brenda Lain, a

Postal Service clerk, to conceal, avoid, or decrease the postage owed to the Postal Service for G&C's mailings. This was done by paying bribes to Lain. In return, Lain used her status as a Postal Service employee to "clear" the mail for entry into the Postal Service mail stream without G&C's postage account being debited for the full postage charges owing for the mail. In this manner, Fernando Guzman, Gene Guzman, and Lain cheated the Postal Service out of millions of dollars owed to it.

## I.    Jurisdiction and Venue

3.    This Court has jurisdiction pursuant to 28 U.S.C. § 1345, 31 U.S.C. §§ 3730 and 3732, and 28 U.S.C. § 1367(a).

4.    This Court has personal jurisdiction over the defendants, and venue is proper in the Northern District of Texas, pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391 and 1395, because at all times material to the allegations in this complaint, the defendants transacted business, could be found in, and/or resided in the Northern District of Texas, and a substantial part of the events or omissions giving rise to the claim occurred here.

## II.    Parties

5.    Plaintiff is the United States, acting on behalf of the Postal Service.

6.    Relator Pamela Davis-Vaughn filed this suit as a *qui tam* action on behalf of the United States.

7.    Defendant Fernando Guzman is an individual who at the relevant time was the president of G&C as well as a part owner of the company. He resides at 346 Blackbird Drive, Spring Branch, TX 78070.

8.     Defendant Eugenio Guzman, also known as Gene Guzman, is an individual who at the relevant time was the vice-president of G&C as well as a part owner of the company.  He resides at 295 Toro Pass, Wimberly, Texas 78676.

9.     Defendant Brenda Brown-Lain, also known as Brenda Lain, is an individual who at the relevant time worked for the Postal Service as a clerk with responsibility for bulk-mail operations (a position also referred to as a bulk-mail technician).  Lain worked at the Postal Service's North Texas Processing & Distribution Center in Coppell, Texas, but as discussed herein, her job also involved clearing mail located at G&C's facility at 1275 Profit Drive, Dallas, Texas 75247 (near Stemmons and Regal Row).  Lain resides at 3620 SE CR 60, Corsicana, Texas 75247.

### III.     The False Claims Act

10.     Originally enacted in the 1863 to combat fraud against the Union Army during the Civil War, the False Claims Act is the primary tool with which the United States combats fraud against the Government and protects the federal fisc.  The Supreme Court has held that the FCA's provisions must be construed broadly to reach "all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).

11.     The FCA establishes liability for various forms of conduct related to the submission of a false or fraudulent claim for payment from the federal government.  Among other things, the FCA imposes liability for knowingly concealing, or knowingly avoiding or decreasing, an obligation to pay or transmit money to the Government, or conspiring to do so.  31 U.S.C. § 3729(a)(1)(C) and (G).

12.     The terms "knowing" and "knowingly" are defined by the FCA to mean that, with respect to the subject false information, a person has actual knowledge of the falsity, acts in deliberate ignorance of the truth or falsity, or acts in reckless disregard of the truth or falsity, with proof of specific intent to defraud not required. *Id.* § 3729(b).

13.     The FCA provides for a recovery of three times the damages sustained by the United States (treble damages), plus a civil penalty for each violation. *Id.* § 3729(a)(1). Pursuant to the Bipartisan Budget Act of 2015, all civil statutory penalties, including those set forth in the FCA, are required to be adjusted annually for inflation. *See* Pub. Law. No. 114-74, § 701, 129 Stat. 584, 599. At this time, FCA penalties assessed after February 12, 2024, whose associated violations occurred after November 2, 2015, are no less than $13,946 and no more than $27,894 for each violation. *See* 28 C.F.R. § 85.5.

### IV.    Bulk Mailing

14.     The Postal Service offers discounted prices for some forms of bulk mail (also known as marketing mail) that is prepared for mailing in specific ways. If sending a minimum amount of mail (typically at least 200 pieces), a bulk mailer can access these discounts by, for example, printing the mail in a certain format and using verified addresses, ZIP codes, and bar codes that enable the Postal Service to deliver the mail more efficiently. Discounted rates also apply if the mail is for a non-profit use (such as a charity solicitation, which was the type of mail that G&C specialized in as relevant here).

15.     Another way that a bulk mailer can obtain further discounts is by arranging for private (non-Postal Service) transportation of the mail partway to its final destination.

For example, if a bulk mailer in Dallas is sending mail to addresses in the Houston area, the bulk mailer can arrange to first transport the mail to Houston privately, instead of depositing the mail with the Postal Service in Dallas. Once the mail reaches Houston, it can then be deposited at a designated Postal Service facility there (a "drop shipment"[1]), from which it is delivered by the Postal Service to the addresses within Houston. Because in this scenario the Postal Service only handles the mail for this final leg of its journey within the Houston area, and the bulk mailer shoulders the cost of transporting the mail from Dallas to Houston, a postage discount is available.

16.     As relevant here, a bulk mail job begins with the bulk mailer preparing the relevant mailing by printing, addressing, and sorting all the mail pieces for a particular job. Postage on bulk mail is often paid for through a combination of (1) physically affixed postage (stamps or metered postage printed directly on the mail piece) and (2) funds debited from a so-called "permit" account that is funded by the mailer and maintained with the Postal Service. For example, there might be a small-value stamp affixed to each piece of mail in a mailing, with the remainder of the postage due for each piece to be paid out of the designated permit account.

17.     To calculate how much is owed in postage, the bulk mailer undertaking a mailer for a non-profit (as applicable to the type of mailings G&C did) fills out a Postal Service form known as the Form 3602 ("Postage Statement – Nonprofit USPS Marketing

---

[1] A drop shipment is made up of mail that is deposited at the destination Postal Service facility by the mailer, bypassing other Postal Service processing and transportation that would have been necessary had the mail been deposited with the Postal Service at the mailer's location.

Mail").[2]  On the 3602 form, the bulk mailer provides various information such as the number and type of mail pieces, the weight, the amount of postage owed for the job, the amount of postage that is already affixed to the mail, and the net postage due, along with a notation of which permit account the postage that is due should be debited from.

18.    The bulk mailer also fills out one or more forms known as the Form 8125 ("Plant Verified Drop Shipment (PVDS) Verification and Clearance") for each drop shipment.  Each 8125 form provides information specific to the portion of the mail job that is slated to be dropped off by the bulk mailer at any given Postal Service facility. For example, consider a mail job from a Dallas bulk mailer with 100,000 mail pieces, half of which are to Dallas addresses and the other half to Houston addresses, and for which the bulk mailer is planning to privately transport the Houston-bound mail to Houston before depositing it with the Postal Service.  The bulk mailer would fill out a single 3602 form listing the entire job of 100,000 mail pieces with a calculation of the postage already affixed and owed.  But then the bulk mailer would also fill out two 8125 forms—one for the delivery of 50,000 mail pieces that will be dropped off at the Postal Service facility in Dallas, and another for the remaining 50,000 mail pieces that will be dropped off at the Postal Service facility in Houston.

19.    To process bulk mail, the Postal Service commonly assigns one of its own employees (known as a clerk or bulk-mail technician) to go to the bulk mailer's business location to "clear" the mail there, rather than necessitating the mail's transport to a local

---

[2] There is also a way to provide this information electronically to the Postal Service, rather than through the use of paper forms, but paper forms were used in connection with the bulk mailings at issue in this case, and therefore the paper-form procedure is what is discussed.

post office for this purpose.  (At larger bulk mailers, there is often a designated "detached

mail unit" that serves as a Postal Service work space within the bulk mailer's facility, just

for this purpose.)

20.    The clearance process works as follows.  The clerk reviews the 3602 form

prepared by the bulk mailer and inspects the mail pieces to confirm that the information

on the 3602 form is correct (e.g., the number of mail pieces, the type and weight,

sortation, palletization, etc.).  The clerk also reviews the 8125 form or forms to verify that

they match with the information provided on the 3602 form.  When the relevant

information is verified, the clerk signs and "round stamps" each form using a special

Postal Service stamp, as shown here (on a 3602 form and 8125 form, respectively):



The clerk then arranges for the information on the 3602 form to be input into an

electronic Postal Service system (known as "PostalOne"), which triggers a debit of the postage owed on the job from the relevant permit account.

21.    Once bulk mail has been so cleared by the clerk, the bulk mailer retains a copy of the 3602 form as well as the original 8125 form(s).  When the bulk mailer then transports the mail to the designated Postal Service drop-off facility(ies), it provides the relevant 8125 form to Postal Service personnel at the facility.  The bulk mailer's furnishing of an original 8125 form in this manner (with the signature and round stamp of the Postal Service clerk) serves as proof that the mail has been cleared by a Postal Service clerk and signifies to the Postal Service personnel at the drop shipment reception site that the mail can enter the mail stream.  From there, the mail is delivered by the Postal Service.

## V.    Defendants' Fraudulent Activity

22.    The defendants' scheme to defraud the Postal Service in connection with G&C's bulk mail jobs was relatively simple:  Lain cleared G&C mail for entry in the mail stream by signing and round-stamping the relevant 3602 and 8125 forms as discussed above, but accepted bribes from Fernando Guzman and Gene Guzman to refrain from inputting the information from certain 3602 forms into PostalOne, thereby ensuring that G&C's permit account would not be debited for the postage owed.  In this manner, mailings were carried out without having to pay the full postage owed, even though Fernando Guzman and Gene Guzman, through G&C, were collecting money for that postage from the G&C client on whose behalf the mail was being prepared and sent.

23.    To make the payoffs to Lain, Fernando Guzman and Gene Guzman would

arrange to meet with her at an off-site location away from the G&C facility—often in the parking lot of a nearby shopping center where a Burger King and other businesses were located—to deliver cash payments to her in exchange for her participation in the scheme. Fernando Guzman and Gene Guzman obtained cash for these payments to Lain by writing checks from a G&C bank account made out to "Jack's," which is a roadside check cashing stand located near the G&C facility in Dallas, as shown here:



An example of one such check made out to Jack's is shown here:



Gene Guzman signed this check and wrote "machine repair" in the memo line, but the check had also apparently been attributed to "stamps" in G&C's records elsewhere, and

when asked about it by G&C's CFO, Gene Guzman confirmed that the check was actually not for stamps ("lol no" he said) but rather was for "my friend," which was a phrase used to refer to Lain:



24.    Fernando Guzman and Gene Guzman also confirmed the existence of the scheme in a covertly recorded conversation in April 2021.  In the recording, Fernando Guzman explains the origins of the scheme, stating (referring to Lain) that "she's the one that came up with the idea":

> She came in here one day and told me, she goes "I got an idea how, um, we can, um, make it look like the money" -- she goes, "As long as you had -- allow me to make some extra money."

Gene Guzman then comments that the scheme, although first done only "on or two jobs," had grown into a "monster," before bemoaning Lain's belief that her profits from the scheme were not as much as Gene Guzman's and Fernando Guzman's:  "Seeing that she always says -- she goes, 'But you gotta remember I get a very small percent of what y'all

get.'  She goes, 'And y'all put the rest in y'all's pocket.'"[3]

25.    In the recording, Gene Guzman explains that they do not employ the

scheme with respect to every mailing G&C does, but rather that it was used selectively:

> It's not easy.  The -- the process isn't easy.  Because just for
> example, turn around and look at that stack right there.
> [referring to a stack of Postal Service paperwork for mail
> jobs]  That's one job, that stack.
>
> * * *
>
> It has 20 jobs in it.  So we had to go through and figure out
> which ones we're going to do that on.
>
> * * *
>
> After we do that, then we have to keep track of the ones that
> we did because it shows up on our -- our portal.  So we have
> to -- we have to monitor the portal, make sure that matches.
> If there's any issue with the mail, we have -- we have to be on
> top of it at all the time --
>
> * * *
>
> One thing that we -- thing with this is it -- it never stops.  It's
> every day.  Every single day, every week, um, and it never
> stops.  And that's problem with it that you -- you have to --
> and if you try to cut corners or skip over something --
>
> * * *
>
> -- you'll be caught.  The Post Office is all over this shit now.

26.    Gene Guzman and Fernando Guzman also discuss in the recording the

details of the scheme and how it benefited G&C (and thereby them) because money that

---

[3] Gene Guzman goes on to offer his response to this complaint from Lain, which is that in his view the
money obtained via the scheme "doesn't go in anybody's pocket" because the money stays "in the
company"—leaving unsaid that of course Gene Guzman and Fernando Guzman are the majority owners
of the company.

was received from G&C's client for postage did not have to be actually paid over to the

Postal Service.  Using as an example a $150,000 payment received from the client for

postage costs, Gene Guzman and Fernando Guzman discuss how that payment would

result in a net sum of $90,000 in "free dollars" (i.e., money that should be paid to the

Postal Service but was not) after using part of the money to cover other costs associated

with the mailing:

> Fernando Guzman:  But the thing is with that money that just
> came in, um, let's say it's 150,000.  Out of that 150,000, um,
> 40,000 of that is gonna go out.
>
> \* \* \*
>
> Gene Guzman:  And some of that's Pitney Bowes.  [referring
> to paying for metered postage or other associated services
> from Pitney Bowes]
>
> Fernando Guzman:  Yeah.  Some of it's Pitney Bowes, too.
>
> \* \* \*
>
> Fernando Guzman:  Yeah.  So we'll have, uh, out of all that
> money, we might have, uh, be able to hold onto 90,000.
>
> \* \* \*
>
> Fernando Guzman:  Um, that's 90,000 in free dollars to keep
> the place going.  Um, but it's -- it's not just, um, 90,000.  It's
> 90,000 worrisome dollars --

27.    In the recording, Fernando Guzman and Gene Guzman also discuss the use

of the G&C permit account in connection with the scheme, and in particular the

significance of the fact that the arrangement between G&C and the third-party client for

whom it was doing mail jobs was to use G&C's permit account to pay the Postal Service

for postage charges, with the client advancing the money or reimbursing G&C.  This was

in contrast to the usual practice with other G&C clients who had their own permit accounts with the Postal Service, and therefore would just make payments directly to the Postal Service from their own accounts without needing to route the money through G&C:

> Fernando Guzman:  The only client we do it on is [third-party client] 'cause they use our permit.  That's the whole key to this is that they're -- everything goes -- funnels through our permit.  And our permit's, like, uh, our -- a -- a bank account. Um, nobody can get into it unless we authorize.  So no one can track the money going in and out of there.
>
> Gene Guzman:  That's why I was saying if we do sell the place, then, uh, well, we -- well, we know that it's happening and then we would just go down and have to open up some new permits for this.  See if we can open up new permits for the company and then shut -- shut the other ones down.  And then we can operate under the new ones for several weeks until the deal's done.  But operate under the -- under those just so --
>
> * * *
>
> -- you know, no one could go back in there and say, you know, well, how come these jobs aren't mail in?  There's no history of this or -- or whatever.  That -- that'll be gone --

28.    Fernando Guzman and Gene Guzman also refer to the significance of their withholding from the Postal Service of certain paperwork—as noted above, one key part of the scheme was that 3602 forms that Lain signed and round-stamped were not input into Postal One by Lain, in order to ensure that G&C's permit account was not debited for postage owed for those mailings—so as to keep the scheme concealed:

> Fernando Guzman:  The thing is that since we're not running the paperwork through the Post Office, or all of it through the Post Office, there is no paper trail.

Gene Guzman:  There's nothing there.  They -- they can
never trace it.

29.    During the same recorded conversation, Gene Guzman also discusses the

logistics of meeting up with Lain to deliver the cash payments to her:

> But taking -- taking the money to her is the -- I guess the, um,
> smallest of the bad details of this thing.  Um, going to, um,
> taking her the money to -- meeting her someplace and, um,
> she doesn't help.  She -- she's -- she's a numbskull.  She
> really is.
>
> * * *
>
> Yeah.  'Cause she, uh, comes busting through the damn
> parking lot to -- to go where you're -- where you're trying to
> meet her at and there are four or five cop cars sitting there
> eating lunch I guess --
>
> * * * -- just waiting -- and she's crossing all the lane.  I go up
> and down the aisles.  She's crossing all the parking lot.  And
> right there and I didn't --
>
> Fernando Guzman:  (Unintelligible) with that pocket full of
> cash.

30.    Referring to talking on the phone with Fernando Guzman while waiting for

Lain to arrive in a parking lot on one occasion, Gene Guzman continues:

> I told him [Fernando Guzman], I said "Okay.  I'm gonna let
> you go.  Here she come."  And I was like, "Oh, my gosh,
> she's -- she's really coming straight across the parking lot and
> there's two Irving cops."

31.    Gene Guzman also discusses his fear of being caught while making the

cash payments to Lain:

> Well, you sit there and you wonder, like, are they waiting for
> me to hand something over?  As soon as you hand it over,
> they -- do you see that shit on TV?

\* \* \*

So it's like, I mean, it's -- it's a worry.  The whole time
you're -- sitting --

At which point Fernando Guzman interjects:

-- inside your car, you're digging for envelopes to find some
place to put the damn money to hand it out the window.

32.     Gene Guzman also discusses the effect on his family if the scheme were to

be discovered:

The time I'm talking about is, uh, the -- the police part that I
think about is, uh, you got you're family sitting at home, uh --

\* \* \*

That has[n't] a clue that what you're getting ready to do.  And
you get busted, now you got your family sitting at home,
Danielle and Rachel everybody just sitting there wondering
what the fuck was he doing?  And now -- now he's in jail for
ten years.

To which Fernando Guzman then responds:

Committed -- and he's in, um, we don't -- we don't discuss
none of this around -- not even our wives.  They don't -- they
have no clue about --

"Nobody knows about this right here," Gene Guzman interjects, to which Fernando

Guzman responds, "Nobody.  And that's the way we need to keep it."

33.     Gene Guzman and Fernando Guzman also gripe about Lain's tardiness in

meeting them to receive cash payments, in the following colloquy:

Gene Guzman:  And then sometimes she'll say she'll be there
at 1 and she don't show up 'till 2 because she can't get out.
So I'm just sitting in the parking lot for two hours.

Fernando Guzman:  Yeah.  I go -- I go through the line at, uh,

Burger King and get -- order me a order of fries so I can get a bag. Trying to get -- you get -- come up with some creative shit for this 'cause if you don't, it -- it does, it scares the shit out of you. And then you're sitting there, all of a sudden you see a cop car roll by real slow. And you get -- you hand her something, then you look up and there's a damn camera right there. Like, fuck.

34.    Fernando Guzman and Gene Guzman also discuss the risks to themselves

and to G&C if the scheme were discovered:

Fernando Guzman: Yeah. They would, uh, they -- we'd be shut down real quick.

* * *

Gene Guzman: You don't know how many times I've had dreams of the FBI walking in here and shutting this place down and taking us out in handcuffs in front of everybody.

35.    Fernando Guzman also alludes to the practice of writing checks from

G&C's bank account to Jack's to obtain cash:

If the IRS does come in here, uh, we're screwed. I mean, there -- there's no way to justify all those checks.

36.    Video surveillance also confirmed the existence of the scheme. On January

19, 2022, Gene Guzman (in a white GMC pickup truck) was recorded on video meeting

with Lain (in a silver Lexus) in a parking lot near the G&C facility, in a manner

consistent with what was discussed on the recorded conversation. In the video recording,

Guzman can be seeing passing an envelope to Lain, as shown here:



Shortly after the envelope is passed from Guzman to Lain, Guzman drives away in his white GMC, leaving Lain visible in her silver Lexus, as shown here:



37.    On another occasion, on January 27, 2022, Fernando Guzman (in a black Chevrolet SUV) was recorded meeting with Lain (in her silver Lexus) and similarly passing an envelope to her, as shown here:



38.     Text messages further corroborate the existence of the scheme.  In a conversation over text on February 3, 2023, Lain texted Fernando Guzman to set up a meeting, with the context and substance of the conversation making clear that the purpose of this meeting would be for Lain to obtain cash.  Lain begins by asking, "What time do you want to meet today?" and then further explains that "I didn't want to ask when you[] called me earlier because Ronnie was in the car with me."



After Fernando Guzman replies by stating that he "wasn't aware that you was coming by today," Lain explains her reason for needing to do so—she needs money; specifically, she "just need[s] to pay some bills by the weekend before late fees [are] tacked on."



After the two confirm the plan to meet, Fernando proposes that they use "bk" as the

location, referring to the parking lot near the Burger King, where such meetings were

routinely held (and as referenced in the recorded conversation above).

39.    In addition to the foregoing information, the government has obtained

copies of various 3602 forms that Lain signed and round-stamped for G&C, from the third-party client on whose behalf these mailings were sent.  As part of the invoices and other communications G&C sent to that client, G&C routinely sent the client copies of these 3602 forms, so that the client would pay G&C for the cost of the postage that G&C was paying (or purportedly was paying) for the mailings.[4]  By comparing the information on these 3602 forms to the information in the Postal Service's PostalOne system, the government has confirmed that there were numerous G&C mailings for which postage was owed to the Postal Service but for which G&C's permit account was never debited, as a result of the scheme between and among Fernando Guzman, Gene Guzman, and Lain as described above.

40.    The government has also obtained copies of 8125 forms that were submitted by G&C to the Postal Service when dropping off bulk mail for delivery by the Postal Service.  Some of these 8125 forms are for mail jobs for which there never was any entry made in the PostalOne system (and thus no debit from G&C's permit account), which is likewise consistent with the scheme whereby Lain was bribed to refrain from having information about certain mail jobs put into PostalOne, so that no postage debit would be made for these jobs.

41.    To sum up, the defendants cheated the Postal Service out of postage that was owed to it through the scheme detailed above.  The following is a sampling of

---

[4] The third-party client also had the capability to track and confirm through other methods that the mail jobs that G&C was engaged to do on its behalf were in fact being done, including through the use of seeded addresses in the mailing lists (i.e., the inclusion of addresses on the mailings lists by which the third-party client could confirm that the mailings were in fact being put in the mail) and by monitoring the return rate on the solicitation requests that the mailings contained (on behalf of various charities).

specific mailings for which the obligation to pay postage charges—which was

specifically noted on the relevant 3602 forms as the "Net Postage Due" amount—was

improperly concealed, avoided, or decreased in this manner:

- <u>November 2, 2020 mailing of 197,407 pieces of mail on behalf of a Dallas nonprofit</u>.  Lain signed and round-stamped the 3602 form for this mailing, which specifically noted the "Net Postage Due" for the mailing along with a notation of the permit account that was supposed to be debited (permit #4043, which was a G&C permit account), as shown here:

| Parts Completed (Select all that apply) | ☒A | ☒B | ☐C | ☐D | ☐E | ☐F | ☐G | ☐H | ☐I | ☐J | ☐L | ☐S | ☐NSA | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | Subtotal Postage(Add Parts Totals) | | | | | | | | | | | $22,342.9700 |
| 2 | Price at Which Postage Affixed (Check one).  ☐ Correct  ☐ Lowest  ☒ Neither | | Complete if the mailing includes pieces bearing metered/PC Postage or precanceled stamps. | 197,407 | pcs. x $ 0.0500 | | | | = Postage Affixed | | | | | $9,870.3500 |
| 3 | | | Incentive/Discount Flat Dollar Amount: | | | | | | | | | - | | |
| 4 | | | Fee Flat Dollar Amount: | | | | | | | | | + | | |
| 5 | Permit #  4043(PERMIT) | | Net Postage Due (Line 1 +/- Lines 2, 3, 4) | | | | | | | | | | | $12,472.62 |

  However, as part of the scheme detailed herein, Lain did not input the information from this 3602 form into PostalOne to trigger a debit from the permit account, and the defendants thereby concealed and improperly avoided and decreased an obligation to pay the amount owing for postage for this mailing to the Postal Service.

- <u>January 4, 2021 mailing of 115,017 pieces of mail on behalf of a Philadelphia nonprofit</u>.  Lain signed and round-stamped the 3602 form for this mailing, which specifically noted the "Net Postage Due" for the mailing along with a notation of the permit account that was supposed to be debited (permit #4043, which was a G&C permit account), as shown here:

| Parts Completed (Select all that apply) | ☒A | ☒B | ☐C | ☐D | ☐E | ☐F | ☐G | ☐H | ☐I | ☐J | ☐L | ☐S | ☐NSA | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | Subtotal Postage(Add Parts Totals) | | | | | | | | | | | $13,048.7450 |
| 2 | Price at Which Postage Affixed (Check one).  ☐ Correct  ☐ Lowest  ☒ Neither | | Complete if the mailing includes pieces bearing metered/PC Postage or precanceled stamps. | 115,017 | pcs. x $ 0.0500 | | | | = Postage Affixed | | | | | $5,750.8500 |
| 3 | | | Incentive/Discount Flat Dollar Amount: | | | | | | | | | - | | |
| 4 | | | Fee Flat Dollar Amount: | | | | | | | | | + | | |
| 5 | Permit #  4043(PERMIT) | | Net Postage Due (Line 1 +/- Lines 2, 3, 4) | | | | | | | | | | | $7,297.90 |

  However, as part of the scheme detailed herein, Lain did not input the information from this 3602 form into PostalOne to trigger a debit from the permit account, and the defendants thereby concealed and improperly avoided and decreased an obligation to pay the amount owing for postage for this mailing to the Postal Service.

- <u>January 6, 2021 mailing of 103,688 pieces of mail on behalf of a Dallas nonprofit</u>.  Lain signed and round-stamped the 3602 form for this mailing, which specifically noted the "Net Postage Due" for the mailing along with

a notation of the permit account that was supposed to be debited (permit #4043, which was a G&C permit account), as shown here:



However, as part of the scheme detailed herein, Lain did not input the information from this 3602 form into PostalOne to trigger a debit from the permit account, and the defendants thereby concealed and improperly avoided and decreased an obligation to pay the amount owing for postage for this mailing to the Postal Service.

- **April 16, 2021 mailing of 73,591 pieces of mail on behalf of a Los Angeles nonprofit.** Lain signed and round-stamped the 3602 form for this mailing, which specifically noted the "Net Postage Due" for the mailing along with a notation of the permit account that was supposed to be debited (permit #4043, which was a G&C permit account), as shown here:



However, as part of the scheme detailed herein, Lain did not input the information from this 3602 form into PostalOne to trigger a debit from the permit account, and the defendants thereby concealed and improperly avoided and decreased an obligation to pay the amount owing for postage for this mailing to the Postal Service.

- **November 30, 2022 mailing of 29,355 pieces of mail on behalf of a Seattle nonprofit.** Lain signed and round-stamped the 3602 form for this mailing, which specifically noted the "Net Postage Due" for the mailing along with a notation of the permit account that was supposed to be debited (permit #4043, which was a G&C permit account), as shown here:

| Postage | | Parts Completed (Select all that apply) | ☒A | ☒B | ☐C | ☐D | ☐E | ☐F | ☐G | ☐H | ☐I | ☐J | ☐L | ☐S | ☐NSA | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | **Subtotal Postage**(Add Parts Totals) | | | | | | | | | | | | | | $3,842.4920 |
| | 2 | Price at Which Postage Affixed (Check one). Complete if the mailing includes pieces bearing metered/PC Postage or precanceled stamps. | ☐Correct | ☐Lowest | ☒Neither | 29,355 pcs. x $ 0.0500 | = Postage Affixed | | | | | | | | | $1,467.7500 |
| | 3 | Incentive/Discount Flat Dollar Amount: | | | | | | | | | | | | | - | |
| | 4 | Fee Flat Dollar Amount: | | | | | | | | | | | | | + | |
| | 5 | Permit # 4043(STAMPS)Net Postage Due (Line 1 +/- Lines 2, 3, 4) | | | | | | | | | | | | | | $2,374.74 |

However, as part of the scheme detailed herein, Lain did not input the

information from this 3602 form into PostalOne to trigger a debit from the permit account, and the defendants thereby concealed and improperly avoided and decreased an obligation to pay the amount owing for postage for this mailing to the Postal Service.

## COUNT I
### (False Claims Act:  Reverse False Claim)
### (31 U.S.C. § 3729(a)(1)(G))

42.    The preceding paragraphs are incorporated by reference.

43.    By virtue of the acts described above, the defendants knowingly concealed, or knowingly and improperly avoided or decreased, an obligation to pay or transmit money or property to the Government.

44.    By virtue of this conduct, the United States was damaged in the amount of the unpaid postage for G&C bulk mailings, plus any other costs or interest, and is entitled to treble damages under the FCA, plus civil penalties for each false claim.

## COUNT II
### (False Claims Act:  Conspiracy)
### (31 U.S.C. § 3729(a)(1)(C))

45.    The preceding paragraphs are incorporated by reference.

46.    As discussed above, the defendants conspired to commit a violation of 31 U.S.C. § 3729(a)(1)(G) and committed numerous overt acts in connection with that conspiracy, including by preparing, signing, and round-stamping 3602 and 8125 forms for mailing for which postage would not be paid, tendering such mail to the Postal Service for delivery despite not having paid the due postage, writing checks on G&C's bank account to Jack's to obtain cash to make payoffs to Lain, and actually meeting for the purpose of making and receiving those payoffs.

47.    By virtue of that conspiracy and the unlawful acts undertaken pursuant to it, the United States was damaged in the amount of the unpaid postage for G&C bulk mailings, plus any other costs or interest, and is entitled to treble damages under the FCA, plus civil penalties for each false claim.

<u>COUNT III</u>
**Common-Law Fraud and Conspiracy to Commit Fraud**

48.    The preceding paragraphs are incorporated by reference.

49.    The defendants, through their course of conduct as set forth above, agreed to commit fraud and did in fact commit fraud against the Postal Service through their scheme to have the Postal Service deliver mail without paying the appropriate postage. By causing the deposit of mail with the Postal Service accompanied by 8125 forms that had been signed and round-stamped by a Postal Service clerk but for which the defendants knew no postage payment was being made, the defendants induced the Postal Service to deliver that mail when it otherwise would not have done so.  The defendants also agreed to conceal, and did in fact conceal, from the Postal Service the information about these mailings that would have resulted in the appropriate postage charges being debited from the G&C permit account, even though Lain was an employee of the Postal Service in a position of trust and confidence.

50.    By virtue of this fraud and conspiracy to commit fraud, the United States was damaged in the amount of the unpaid postage for G&C bulk mailings.

<u>COUNT IV</u>
**Unjust Enrichment**

51.    The preceding paragraphs are incorporated by reference.

52.    This is a claim for the recovery of monies by which the defendants have been unjustly enriched through their course of conduct of cheating the Postal Service out of postage owed to it.

53.    The United States is entitled to recover all such monies from defendants.

## COUNT V
## Money Had and Received

54.    The preceding paragraphs are incorporated by reference.

55.    The defendants received monies that, in equity and good conscience, belonged to the Postal Service and should have been paid to it in connection with the bulk mail that the Postal Service delivered for G&C without appropriate postage having been paid.

56.    The United States is entitled to recover all such monies from defendants.

## JURY DEMAND

The United States demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF AND JURY DEMAND

The United States requests that the Court enter judgment against Fernando Guzman, Eugenio Guzman (also known as Gene Guzman), and Brenda Lain (also known as Brenda Brown-Lain) and grant the following relief:

(a)  on Counts I and II, treble the damages sustained by the United States for the defendants' violations of the False Claims Act, plus the maximum civil penalties allowed by law for each false claim;

(b)  on Count III, the damages sustained by the United States by reason of the

defendants' fraud and conspiracy to commit fraud;

      (c)  on Counts IV and V, the amounts by which the defendants were unjustly

enriched in the form of monies not paid to the Postal Service for postage that was owed;

      (c)  pre- and post-judgment interest as allowed by law; and

      (d)  all other relief to which the United States is justly entitled.

                Respectfully submitted,

                CHAD E. MEACHAM
                ACTING UNITED STATES ATTORNEY

                /s/ Brian W. Stoltz
                Brian W. Stoltz
                Assistant United States Attorney
                Texas Bar No. 24060668
                1100 Commerce Street, Third Floor
                Dallas, Texas 75242-1699
                Telephone:      214-659-8626
                Facsimile:      214-659-8807
                brian.stoltz@usdoj.gov

                Attorneys for the United States